# United States Court of Appeals
## For the First Circuit

No. 06-2339

CAMBRIDGE LITERARY PROPERTIES, LTD.,

Plaintiff, Appellant,

v.

W. GOEBEL PORZELLANFABRIK G.m.b.H. & CO. KG.; GOEBEL ART
G.m.b.H., d/b/a Goebel of North America,

Defendants, Appellees,

ULRICH STOCKE; GOEBEL VERWALTUNGS-UND; BETEILIGUNGSGESELLSCHAFT
m.b.H.; WILHELM GOEBEL,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Circuit Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.

Henry Herrmann for appellant.
David P. Shouvlin with whom Porter, Wright, Morris & Arthur
LLP, Joseph D. Steinfield, David E. Plotkin, and Prince, Lobel,
Glovsky & Tye LLP were on brief for appellee.

December 13, 2007

**LYNCH**, <u>**Circuit Judge**</u>. The district court entered summary judgment for defendants due to plaintiff's failure to meet the Copyright Act's three-year statute of limitations in this dispute over profits from the sale of Hummel figurines and images. <u>Cambridge Literary Properties, Ltd.</u> v. <u>W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg. (Cambridge II)</u>, 448 F. Supp. 2d 244 (D. Mass. 2006). We affirm.

The key facts are set forth here and in our earlier opinion on a different issue in this case. <u>Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg. (Cambridge I)</u>, 295 F.3d 59, 61-62 (1st Cir. 2002). Plaintiff Cambridge Literary Properties, Ltd. seeks a share of the profits reaped by defendants W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg. and Goebel Art G.m.b.H. (collectively, "Goebel") for the use of images taken from a German book published in 1934, <u>Das Hummel-Buch</u>, in which Cambridge asserts a copyright interest. Specifically, Cambridge, which acquired its purported "rights" from two sets of heirs of a putative joint author of the book, seeks an accounting and imposition of trust on past and future profits Goebel realizes from the distribution of figurines derived from the book, Goebel's use of the particular figure of "The Merry Wanderer" as its trademark or logo, the membership fees in the M. I. Hummel Club in the United States, and the like. Whether Cambridge in fact is a co-owner, through co-authorship, of any of its asserted rights is

hotly contested by Goebel in its summary judgment papers and its brief on appeal. Indeed, Cambridge's complaint asserts facts acknowledging Goebel's claims of sole ownership.

The federal courts clearly have jurisdiction over this case. Cambridge chose to file the action in federal district court, and jurisdiction has never been at issue. We affirm the district court's grant of summary judgment, affirming the recommendation of the magistrate judge. Plaintiff's ownership of any interest, as we have said, is hotly disputed, and is an issue governed by the Copyright Act. There is no agreement or stipulation of ownership. Yet Cambridge did not seek an adjudication of its ownership rights before seeking whatever remedy it may have if it has any ownership rights. Thus, this case is not a dispute between admitted co-owners. Rather, the complaint attempts to evade the issue of whether Cambridge has any ownership rights by simply asserting that Cambridge is a co-owner and then alleging that Cambridge, as a co-owner, is entitled under state law to an accounting and equitable trust. As a result, Cambridge argues, the federal statute of limitations that applies to establishing copyright ownership under the Copyright Act does not apply; rather, the state statute of limitations for an accounting applies.

The accounting and equitable trust claims created by state law are premature. Such claims may well be governed by state

law, but they are not ripe and necessarily rest upon plaintiff having met the antecedent showing that it has ownership rights under the Copyright Act. Plaintiff may not assert the state-law claims for accounting or equitable trust without establishing that it is a co-owner. Whether Cambridge is a co-owner in turn depends, on the facts of this case,[1] upon the federal Copyright Act. This in turn requires that Cambridge have asserted its ownership claims within that statute's limitations period. The congressional intent that the Act's limitations period applies to claims of ownership under the Act may not be undercut by Cambridge's subterfuge.[2]

---

[1] Not all claims of co-ownership will arise under the Copyright Act, and our decision does not affect such cases. For example, at times, whether there is co-ownership may be determined by the terms of a contract governed by state law or through other ownership interests governed by state law and thus not require application of the Copyright Act. See, e.g., Royal v. Leading Edge Prods., Inc., 833 F.2d 1, 4-5 (1st Cir. 1987) (rejecting federal question jurisdiction where claim of co-ownership, "in its very nature and essence, [was] one for breach of contract" under state law). In other cases, such as where co-ownership results from purported statutory co-authorship, the question of co-ownership is governed by the Copyright Act. See 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.01[A][1][b] (2007) (endorsing view that in an action seeking declaratory judgment of plaintiff as co-author and for an accounting, federal jurisdiction is exclusive because "copyright ownership by reason of one's status as co-author arises directly from the terms of the Copyright Act itself"); see also Gaiman v. McFarlane, 360 F.3d 644, 652-53 (7th Cir. 2004) (collecting cases).

[2] We do not hold, nor is it a ramification of our holding, that federal courts have exclusive subject matter jurisdiction to adjudicate all accounting claims between the co-owners of a copyrighted work.

Under the Act, the cause of action accrues when a plaintiff "knows or has reason to know of the act which is the basis of the claim." Santa-Rosa v. Combo Records, 471 F.3d 224, 227 (1st Cir. 2006), cert. denied, 127 S. Ct. 2265 (2007) (internal quotation omitted). We reject plaintiff's novel approach to accrual. Cambridge may not escape the limitations bar if the statute barred the claims of the heirs from which it acquired the "rights." Young v. Lepone, 305 F.3d 1, 17 (1st Cir. 2002). Cambridge is also barred if it failed to timely act within the limitations period after it acquired the rights. Here, Cambridge and the heirs, on the undisputed facts, were put on sufficient notice to result in accrual more than three years before plaintiff instituted suit. Further, there is no basis for equitable tolling of the three-year limitations period.

I.

In describing the facts of the dispute, we make all reasonable inferences in favor of Cambridge, the party opposing summary judgment. T-Peg, Inc. v. Vermont Timber Works, Inc., 459 F.3d 97, 102 (1st Cir. 2006).

Berta Hummel, as a young woman in Germany in the early 20th century, had a talent for drawing images of children in folk dress. In 1931, Hummel took her vows as a member of the Congregation of Franciscan Sisters at the Convent of Siessen ("Convent") and became Sister Maria Innocentia Hummel. Sister

-5-

Hummel and the Convent published some of Sister Hummel's drawings as postcards and devotional pictures.

In 1934, a German publishing company, Emil Fink Verlag ("Fink"), approached Sister Hummel and the Convent about publishing some of Sister Hummel's artworks in a book. In May of that year, Sister Hummel, the Superior of the Convent, and Fink entered into an agreement authorizing Fink to reproduce forty of Sister Hummel's works in Das Hummel-Buch. The contract specified that the book would include, in addition to the drawings, poems and other text. About six months later, Fink contracted with Margarete Seemann, a Viennese poet, for the production of an introduction and fifty poems for use in the book.

Fink first published Das Hummel-Buch in Germany in December 1934. Fink applied to the United States Copyright Office for a copyright in the book in June 1936. Fink's application lists Emil Fink Verlag as the "copyright owner," and Hummel and Seemann as "author[s] or translator[s]."

Back in Germany, Fink was not the only firm seeking to commercialize Sister Hummel's drawings. Franz Goebel, then the head of Goebel, also entered into a contract with Sister Hummel and the Convent in January 1935. In that contract, Sister Hummel and the Convent assigned to Goebel the exclusive right to manufacture and market porcelain figurines based on Sister Hummel's drawings. Goebel continues to produce its line of "M. I. Hummel figurines" to

-6-

this day.  Goebel Art, a wholly owned subsidiary of Goebel, acts as the exclusive distributor and licensing agent for Goebel's United States copyright interests derived from the 1935 contract.  In addition to the sale of figurines, Goebel also profits from the Hummel copyrights through Goebel Art's "M. I. Hummel Club," which generates substantial income from membership fees.

In June 1962, Fink applied for a renewal copyright in "Das Hummel-Buch, by Berta Hummel . . . [preface and verses by] Margarete Seemann."  The publishing house listed itself as "proprietor of copyright in a work made for hire."  In 1971, Goebel purchased all of Fink's copyrights in Hummel-related works, including the American copyright in Das Hummel-Buch.  That sale was also memorialized in documents filed with the Copyright Office.

Goebel was not always the sole American distributor of Hummel figurines.  Until the mid-1990s, Goebel contracted with Schmid Brothers, Inc. ("Schmid") to distribute the figurines in the United States.  Schmid and Goebel quarreled repeatedly over their business arrangement in the courts of Germany and the United States.  Sometime in the late 1960s, an attorney named Henry Herrmann began working for Schmid on matters related to disputes with Goebel.  By 1971, Herrmann had obtained for Schmid an assignment of copyrights from Sister Hummel's family; Sister Hummel had died in 1946.  Herrmann also represented Schmid in a number of

lawsuits pertaining to the Hummel rights. Herrman is the driving force behind Cambridge in the present dispute.

In 1992, during a lawsuit filed in the Eastern District of New York, Schmid and Goebel entered into a consent judgment that stated that the two parties owned "respective undivided one-half interests in the United States renewal copyright in [Das Hummel-Buch]." Herrmann executed the agreement on behalf of Schmid.

Schmid, which held interests in Das Hummel-Buch, filed for bankruptcy in 1993. Herrmann, as a creditor in the bankruptcy proceedings, filed a claim for over $10,000,000 based on a contingency fee agreement with his former client. Herrmann settled his claim for $3,750,000. Goebel, for its part, acquired Schmid's rights to the book in the wake of Schmid's bankruptcy. With that acquisition, Goebel's ownership interest in the United States copyright to Das Hummel-Buch appeared to be perfected.

At some point during the Goebel-Schmid litigation, Herrmann came to think that Margarete Seemann's heirs might retain an interest in the United States copyright for Das Hummel-Buch because Seemann's poems appear in the book. In order to exploit that interest, Herrmann sought an assignment of copyright interests from Seemann's heirs. Herrmann formed Cambridge in August 1995 to effectuate that purpose. Herrmann continues to be the sole shareholder in Cambridge in addition to representing the company in this litigation.

Also in 1995, Herrmann identified Seemann's heirs and assignees of Seemann's alleged United States copyright interests in Das Hummel-Buch. They were Maria Romanowicz, a resident of Vienna, and Dr. Alexandrine Cermanovic-Kuzmanovic, a resident of Belgrade. Herrmann approached both heirs in August and September of 1995 with offers to purchase such United States copyright interests as they held in the book.

On September 6, 1995, Maria Romanowicz signed a contract assigning to Cambridge all of her "right, title and interest in and to any and all United States Copyright Renewals in any of the works authored and/or co-authored by [Seemann], including, without limitation, the work 'Das Hummel-Buch.'" The contract also specified that "included in this assignment are any and all of my legal and/or equitable monetary claims and causes of action I may have under American laws as of the date hereof for payments . . . and/or accountings against third parties" for their exploitation of the United States copyright to Das Hummel-Buch. As to the other heir, although Herrmann first approached Cermanovic-Kuzmanovic in 1995, he did not obtain an assignment from her to Cambridge until February 1999. The terms of the second assignment were identical to the first.

Having thus assembled what it represented to be a fifty-percent interest (based on any interest held by the poet Seemann) in the United States copyright to Das Hummel-Buch, Cambridge filed

the current action in the District of Massachusetts in February 2000, basing jurisdiction on diversity and, conditionally, on federal question jurisdiction.[3]  Cambridge's complaint pleaded two "claims":  one for "an accounting from [Goebel] of their profits from their use and benefit of said book and the two and three dimensional works derived therefrom"; and a separate claim for unjust enrichment seeking as a remedy "restitution and [] a decree imposing a constructive trust . . . on [Goebel's] intellectual property relating to the works derived from the [b]ook."  The complaint states, in conclusory fashion, that Cambridge is entitled to these remedies due to its status as "joint legal and/or beneficial owner[] of the United States Renewal Copyright" in Das Hummel-Buch.[4]

---

[3]      The complaint states that the District of Massachusetts "has diversity jurisdiction . . . pursuant to [28 U.S.C. § 1332(a)]" and "[f]urther, if this action were determined to be arising under Federal copyright statutes, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338."  Am. Compl. ¶¶ 16-17.

[4]      At the same time, however, the complaint concedes that Goebel and other parties had previously asserted the ownership rights to the United States copyright in Das Hummel-Buch without ever acknowledging any ownership interest by Seemann or her heirs. See, e.g., Am. Compl. ¶¶ 44-45 ("Goebel, claiming as alleged owner of the Book Renewal . . . has previously, in a United States District Court, made claim for alleged infringement of the Book Renewal."); id. ¶ 66 (alleging that a 1992 federal court consent decree named Schmid and a Goebel subsidiary "undivided joint owners of the Book Renewal").  Similarly, the complaint reveals that Goebel had previously represented the contents of the book as "works for hire" rather than "joint works," which would mean that even if Seemann held the copyright in her poems, her rights would not extend to Hummel's illustrations.  Am. Compl. ¶ 44.

-10-

Cambridge does not claim it owns any independent copyright interests in any images created by Sister Hummel. Rather, it says its rights are derivative from Seemann.[5] Seemann, Cambridge alleges, obtained an interest in the United States copyright for Das Hummel-Buch by virtue of her co-author status with Hummel and/or Fink. Cambridge alleges the book was a "joint work" between Hummel and Seemann, and that the copyright in the book therefore granted Seemann rights in all the contents of the book, including Hummel's illustrations. Cambridge further alleges that Goebel based the designs of at least some of the Hummel figurines on particular images from the book, and not on Hummel artworks of independent provenance. Those figurines, according to Cambridge, represented works derivative of the book. Cambridge, assignee of Seemann's heirs and half-owner, along with Goebel, of the book copyright, would thus be entitled to half of the proceeds of all exploitation of the book copyright in the United States. From these co-ownership rights, Cambridge argues, it is owed an accounting for Goebel's profits from the sale of at least some of its figurines and other uses of Hummel imagery in the United States. Goebel has disputed these contentions throughout this litigation.

---

[5]  At no time has Cambridge alleged that Goebel exploited Seemann's written contributions to Das Hummel-Buch.

-11-

The district court initially dismissed Cambridge's suit for want of personal jurisdiction. This court reversed and remanded. Cambridge I, 295 F.3d at 66-68. On remand, the district court again did not reach the merits of Cambridge's accounting or unjust enrichment claims. Instead, it granted Goebel's motion for summary judgment on the grounds that the Copyright Act's three-year statute of limitations barred Cambridge's suit. Cambridge II, 448 F. Supp. 2d at 247; see also 17 U.S.C. § 507(b).

## II.

We review de novo the entry of summary judgment in the district court. T-Peg, 459 F.3d at 111. Summary judgment is proper here if the record, read favorably to Cambridge, reflects no genuine issues of material fact and the undisputed facts demonstrate that Goebel is entitled to judgment as a matter of law. T-Peg, 459 F.3d at 111; Fed. R. Civ. P. 56(a).

Cambridge contends on appeal that Massachusetts law governs a claim for accounting for profits, and that consequently the Copyright Act's statute of limitations does not apply. The issue is more complicated than that. This framing of the argument assumes that the question of ownership had been resolved, by agreement or by a court judgment, before the state-law remedy of accounting was sought. An action brought by a copyright co-owner seeking equitable remedies from another co-owner, even if those remedies are governed by state law, requires that the plaintiff

-12-

first establish the existence of the right giving rise to the remedy. See, e.g., MacDonald v. Page Co., 146 N.E. 727 (Mass. 1925); 1A C.J.S. Accounting § 23 (2007). In the case of an accounting for profits by a co-owner of a copyright where ownership is in dispute, that means the claimant must first establish it has ownership as a predicate to an award of an accounting for profits. The ownership question may be one of state law or of federal law, depending on the facts of a case. In cases involving rights such as those at issue here, plaintiffs usually raise this threshold issue by seeking a declaratory judgment for ownership. See Santa-Rosa, 471 F.3d at 225-26; Royal v. Leading Edge Prods., Inc., 833 F.2d 1, 2 (1st Cir. 1987); see also, e.g., Gaiman v. McFarlane, 360 F.3d 644, 648 (7th Cir. 2004); Merchant v. Levy, 92 F.3d 51, 53 (2d Cir. 1996); Zuill v. Shanahan, 80 F.3d 1366, 1368 (9th Cir. 1996); Goodman v. Lee (Goodman II), 78 F.3d 1007, 1009 (5th Cir. 1996).

Cambridge's complaint does not request a declaration of its co-ownership of the United States copyright in Das Hummel-Buch. It both asserts ownership and acknowledges that Cambridge's ownership is in controversy. The omission does not remove the predicate question of ownership from the case, and whether Cambridge has any ownership interest is in dispute, even on the face of the complaint.

A.        Applicability of the Copyright Act

Copyright cases may raise different issues, some of which are controlled by federal law and some of which may refer to and be controlled by state law. We noted as much about this very case in Cambridge I. See 295 F.3d at 64 n.4 (recognizing that Cambridge's claims might necessitate reference to "federal copyright law and German contract law as to whether Hummel, Seemann, and Fink are co-owners; Austrian inheritance law if the Seemann rights are disputed; federal copyright law as to whether the figurines are derivative works; and to the law of any of several jurisdictions as to the rights and defenses among co-owners").

Here the necessary initial question -- ownership of copyright interests -- is governed by the Copyright Act. Because that question is governed by the Act, the Act's statute of limitations applies as well. See 17 U.S.C. § 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."). It would be anomalous and, we think, contrary to congressional language and intent not to apply the Act's limitations period when the Act governs the question of ownership interest.

Our view that a single copyright case can raise different issues governed by different laws is well accepted. In an instructive if not directly parallel case, the Supreme Court

-14-

addressed the applicability of federal and state law in actions asserting copyright interests. In De Sylva v. Ballentine, 351 U.S. 570 (1956), the mother of the illegitimate child of a deceased composer sued for a declaratory judgment that the child possessed an interest in the renewal copyrights of the composer's works; the mother also sought an accounting for past profits. Id. at 571-72. The ownership determination hinged on a provision in the Copyright Act, then in effect, which was ambiguous on two issues: whether children of authors could inherit copyright renewal rights during the lifetime of the author's widow; and whether "children," as used within the Copyright Act, included illegitimate offspring. Id. at 572.

The Court held that "[t]he scope of a federal right is, of course, a federal question," and interpreted the ambiguous Copyright Act provision to resolve the ownership issue. Id. at 580. The Court did reference state law in the course of construing the Act. As to the discrete issue of whether the term "children" included illegitimate offspring, the Court noted that "there is no federal law of domestic relations, which is primarily a matter of state concern." Id. Because the federal Act did not address the issue at hand, which was "really a question of the descent of property," the Court looked to the California Probate Code, the source of law that would govern descent of the composer's estate,

-15-

to give content to the term "children" as used in the Copyright Act.  Id. at 581-82.

The current Copyright Act treats determinations of the rights at issue here as questions of authorship status and initial ownership of copyrights.  Section 101 of the current Act expressly defines terms such as "copyright owner," "joint work," and "work made for hire."  17 U.S.C. § 101.  Section 201 of the Act explicitly controls vesting of copyright in authors; sets out the ownership status of authors and co-authors of joint works; and establishes copyright ownership by employers who commission works made for hire.  17 U.S.C. § 201.  There is a substantial federal interest in having the federal statute of limitations applied to these determinations.

Indeed, the Act also contains a provision that expressly preempts state common-law copyright protection and all other "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . ."  17 U.S.C. § 301(a).  That provision, while by its terms governs the preemption of causes of action, presupposes the existence of "legal or equitable rights" which are, in turn, defined elsewhere in the Act.

Our concern is thus not, as Cambridge suggests, with whether the Act preempts a state accounting cause of action.  That is a hypothetical question on the facts of this case, and we do not

give advisory opinions.  Our concern is only with whether the federal statute of limitations applies to the prerequisite issues of ownership which are governed by the Act.

All of the federal circuit courts of appeal that have addressed the issue, including this one, agree that a determination of copyright ownership based on a disputed allegation of co-authorship presents a federal question that arises under, and must be determined according to, the Copyright Act.  See Santa-Rosa, 471 F.3d at 227; see also, e.g., Gaiman, 360 F.3d at 652-53; Merchant, 92 F.3d at 55-56; Goodman II, 78 F.3d at 1010.[6]  Where an ownership claim arises under the Copyright Act, the Act's three-year statute of limitations likewise applies.  Gaiman, 360 F.3d at 653; see also Santa-Rosa, 471 F.3d at 227; Merchant, 92 F.3d at 56.  Some cases address the question in the context of performing an "arising under" analysis to determine whether there is federal jurisdiction. See, e.g., Merchant, 92 F.3d at 55; see also Royal, 833 F.2d at 2-3 (adopting test for original federal subject matter jurisdiction in T. B. Harms v. Eliscu, 339 F.2d 823 (2d Cir. 1964)).  Here, there

---

[6]     Nothing in our decision in Royal is inconsistent, contrary to Cambridge's argument.  In Royal, we upheld dismissal of a claim for declaration of copyright ownership because that claim did not create federal question jurisdiction.  833 F.2d at 2. Here, jurisdiction is not at issue.  In addition, the Royal claimant's theory of ownership turned not on his status as a co-author, but on an alleged breach of a royalty agreement between the claimant and his employer.  Id. at 1-3.  Because "[the claimant's] assertions gr[e]w out of his purported contract rights," state law controlled their resolution and failed to create federal subject matter jurisdiction.  Id. at 3.

is diversity jurisdiction, but the question of whether there is a federal question under the Copyright Act as to the prerequisite of co-ownership involves parallel reasoning.

Cambridge attempts to avoid this conclusion by arguing that "the Act's limitations do not apply to actions for accounting between co-owners." As we have said, that is not the issue. Cambridge argues that it is the fact that the action is one which the complaint labels as being for an accounting that makes the difference.[7] If co-ownership were conceded and the only question was a claim for accounting of profits from the other joint owner, then Cambridge could argue the suit was only for an accounting of profits under state law. Gaiman, 360 F.3d at 652. But under a long line of federal cases, Cambridge must first establish that it is a co-owner, and the answer to that lies in the application of the Copyright Act and subjects that claim to the Act's statute of limitations. See id. at 652-53. Cambridge cannot avoid this by the stratagem of failing to ask for a declaration of ownership as

---

[7] Our holding is that the federal period of limitations, and not a state limitations period, applies to the predicate question of co-authorship rights, which is governed by the Copyright Act. We see no need to address the defense of preemption raised by Goebel, see 17 U.S.C. § 301, or Cambridge's argument that there is no preemption. In particular, Cambridge argues that a grandfathering provision saves the accounting claim from preemption because it involves "undertakings commenced before January 1, 1978," i.e., Goebel's exploitation of Hummel imagery from 1935 to the present. Id. § 301(b)(2). Our holding rests on the fact that the issue of ownership must be addressed first and is controlled by the Copyright Act's limitations period. This is true whether or not the claim for an accounting under state law is preempted.

a method of avoiding the federal limitations period for an ownership claim governed by the federal Act.[8]

Cambridge cites Goodman II, 78 F.3d 1007, as support for its argument. That case does not support Cambridge's position; it does support our view of the case. In Goodman, a musician sued the heirs of her former performing partner for a declaration of co-authorship and an accounting for royalties from the song "Let the Good Times Roll." Goodman v. Lee (Goodman I), 815 F.2d 1030, 1031 (5th Cir. 1987). The district court granted defendants' motion for summary judgment for lack of subject matter jurisdiction. Id. The Fifth Circuit reversed "[b]ecause . . . exclusive federal district court jurisdiction exists in an action for a declaratory judgment to establish joint authorship of a copyrighted work . . . ." Id. at 1032.

After trial, the Goodman jury found that the plaintiff "was a co-author of [the song]" and that her claim was timely because "she 'did not know or should not have known'" until the year before filing suit that her co-author had listed himself as the sole author on the copyright registration. Goodman II, 78 F.3d

---

8    If Cambridge is arguing that the grandfathering clause in section 301(b)(2) somehow makes the co-authorship issue not an issue of federal law under the Act, then Cambridge is wrong. By its own terms, section 301(b) is limited in its application only to "rights or remedies under the common law or statutes of any State." Id. § 301(b). Pre-1978 claims of co-author status are governed by the Copyright Act of 1909. Cf. De Sylva, 351 U.S. at 580.

at 1010. Only after the co-authorship issue was resolved did the court address the issue of an accounting.

On appeal in Goodman, the defendants contested the district court's remedial award of an accounting. The Fifth Circuit held that the remedy of an accounting did not itself present any federal questions, unlike the resolved predicate question of ownership, and that Louisiana law, including the state statute of limitations, governed the accounting issues. Id. at 1012-13.

The Goodman decisions are entirely consistent with the prevailing view that disputed claims about whether there is co-authorship require application of the Copyright Act and the Act's statute of limitations. The portion of the opinion that applied state law is inapposite here, because it dealt with accounting issues that only arose following a proper determination of copyright ownership under the Copyright Act. Cambridge has not cleared that hurdle of establishing ownership.[9]

The controversy over Cambridge's copyright interests directly involves Seemann's authorship status and her initial ownership of the copyright in Das Hummel-Buch, as well as the effect of various registration documents and transfers. The

_____

[9]    The question of whether a claim for an accounting for profits realized from exploitation of a jointly-owned copyright -- once that ownership is established -- is subject to state-law limitations is not one that we need decide. See supra note 7.

-20-

Copyright Act clearly covers these issues. See 17 U.S.C. §§ 101, 201, 204-05, 410. We hold as a matter of law that on the facts of this case, Cambridge's allegations of co-ownership present an issue subject to the Copyright Act and that the Act's three-year statute of limitations applies to that issue, which must be resolved before the issue of an accounting arises.

B.      Application of the Act's Accrual Rules to These Claims

The Copyright Act bars lawsuits premised on a copyright claim brought after three years from accrual of that claim. 17 U.S.C. § 507(b). A claim accrues when a plaintiff "knows or has reason to know of the act which is the basis for the claim." Santa-Rosa, 471 F.3d at 227 (internal quotation omitted). If Cambridge's claims accrued earlier than February 24, 1997, three years before Cambridge filed the present suit, the suit is barred.

In Santa-Rosa, we applied the accrual test to a 2004 suit by a renowned salsa musician requesting a declaration of co-ownership in several recordings he allegedly co-authored in the mid-1980s. 471 F.3d at 225-26. We affirmed dismissal of the suit as time-barred. Id. at 228.

Santa-Rosa held that the plaintiff knew or should have known of the basis for his claim to co-authorship of the songs at the moment of their creation. Id. After all, "'[a] co-author knows that he or she jointly created a work from the moment of its creation,'" and thus would have been aware at that time of a claim

for co-ownership.  Id. (quoting Merchant, 92 F.3d at 56); cf. 17 U.S.C. § 101 (defining "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole" (emphasis added)).  "Thus," Santa-Rosa reasoned, "there is little question that [plaintiff's] claims for co-ownership accrued as soon as he finished recording each album."  471 F.3d at 228.  In Santa-Rosa the claimant was the co-author, and not an heir.

Santa-Rosa acknowledged, however, that other courts have applied the accrual test differently.  For instance, the Ninth Circuit has held that a claim for a declaration of ownership under the Copyright Act does not accrue until "a 'plain and express repudiation of co-ownership is communicated to the claimant.'" Id. (quoting Zuill, 80 F.3d at 1369).  Even under this more claimant-friendly standard, however, the Santa-Rosa plaintiff could not prevail, because there was plain and express repudiation of co-ownership from the fact that the defendant record company "openly, and quite notoriously, sold [plaintiff's] records without providing payment to him" more than three years before the plaintiff filed suit.  Id.

Under the reasoning of Santa-Rosa, the accrual inquiry in this case would initially be directed at Margarete Seemann and her knowledge of potential ownership claims in the 1930s.  If, as Cambridge claims, Seemann had co-authored Das Hummel-Buch as a

-22-

joint work, she would by definition have been aware of her status as joint owner of the book and all of its contents. Seemann also conceivably received notice of a repudiation of her ownership status when Goebel began marketing Hummel figurines in the 1930s and failed to pay Seemann any royalties. Under a literal reading of Santa-Rosa, Seemann's claims for a declaration of co-authorship of the book would have accrued long before her death in 1949.

The Santa-Rosa model for accrual does not work well here because the Copyright Act did not contain a statute of limitations for civil actions until 1957. See 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.05[A] (2007). We also do not reach the question of whether the claims based on Seemann's work accrued within three years after a statute of limitations was added to the Copyright Act. Instead, we ask whether any claims held by Cambridge and/or the assignors of the rights Cambridge alleges descended from Seemann accrued before the case was brought.

1.      The Romanowicz Assignment

Maria Romanowicz, Seemann's heir in Vienna, assigned whatever rights she may have had in the book's United States copyright to Cambridge by September 6, 1995. We do not address whether Romanowicz's rights were time-barred at that time.

Cambridge did not file suit within three years of acquisition of those rights, and based on its knowledge at the time, the claim is barred. Cambridge was on notice of a

-23-

repudiation of those rights by the time of the assignment. Herrmann, Cambridge's sole shareholder and negotiating adversary to Romanowicz, was privy to the Schmid-Goebel settlement agreement stipulating that those two companies owned all rights to the book in the United States. Moreover, Herrmann knew that Romanowicz was not receiving royalties from Goebel on the sale of Hummel figurines.

The most cogent evidence of accrual is Cambridge's own motivation for approaching Romanowicz. What Cambridge sought to purchase was essentially a cause of action against Goebel. Cambridge was aware of whatever potential claims against Goebel the purchase would bolster, and even ensured that the assignment contract specified a transfer of any and all claims for accountings under United States law. With respect to the Romanowicz assignment, the statute of limitations under the Copyright Act started running against Cambridge no later than September 1995. Because there was no tolling (as we explain below), section 507(b) of the Copyright Act barred Cambridge's claims based on the Romanowicz assignment before this suit was filed in 2000.

2.        The Cermanovic-Kuzmanovic Assignment

On the undisputed facts, Dr. Alexandrine Cermanovic-Kuzmanovic, Margarete Seemann's heir in Belgrade, knew -- or reasonably should have known -- about the basis for a claim of co-ownership of the United States copyright to Das Hummel-Buch before

February 1997.  In making this determination, we do not decide whether Seemann co-authored the book, whether Goebel's figurines were derivatives of the book, or whether any rights that descended from Seemann to the heirs entitled the heirs to share in profits derived from sales of the figurines.  The accrual test looks to the existence of a claim, not its resolution.

Herrmann first contacted Cermanovic-Kuzmanovic's attorney in Vienna, Dr. Theodor Petter, in 1995.  Petter referred Herrmann directly to Cermanovic-Kuzmanovic to discuss an assignment of copyrights.  Herrmann testified that in a conversation that same year, Cermanovic-Kuzmanovic indicated that "she was very interested in gaining some income based upon an assignment of her American rights . . . ."  She referred Herrmann back to Petter, and the two attorneys commenced negotiations.[10]  At that time, Cermanovic-Kuzmanovic knew she was not receiving any payments on any inherited co-author ownership right in Das Hummel-Buch.  She also was aware that Fink had not paid her royalties on the original German book, in contrast with Fink's payment until 1973 to the heirs of royalties on an English-language The Hummel Book.[11]

---

[10]    Petter died soon thereafter.  In 1996, Petter's daughter, Dr. Elizabeth Fetcher-Petter, took over her father's law practice and resumed negotiations with Herrmann.  Fetcher-Petter described those negotiations as "productive but extremely lengthy"; the assignment from Cermanovic-Kuzmanovic to Cambridge was finally executed on February 9, 1999.

[11]    A stipulation between the parties indicates that Fink paid book royalties to the heirs until 1973.  Cambridge argues that

-25-

Starting at the latest in 1995, when she was contacted by Herrmann, Cermanovic-Kuzmanovic had every motivation to ascertain the existence and potential value of her rights in the book, and she had counsel in Vienna to assist her in that task. Yet she did not bring suit within three years, even though readily available inquiries would have revealed numerous repudiations of the "rights" Cambridge sought to purchase.

There were a number of different signs of repudiation, which in total require the conclusion that the claims had accrued. Publicly available documents in the United States Copyright Office raised issues about Seemann's purported ownership of Das Hummel-Buch. First, the original 1936 application for a United States copyright in the book lists the publishing house Emil Fink Verlag as the "copyright owner." Second, the 1962 application for the renewal copyright lists the publisher as "proprietor of copyright

---

"[t]hese payments constituted an affirmation of [Cermanovic-Kuzmanovic's] interests [in the book] both by Fink and [Goebel] . . . ." Cambridge's argument fails. The stipulation states that Fink paid royalties to Seemann and her heirs for sales of The Hummel Book, the English translation of Das Hummel-Buch. The 1934 contract between Fink and Seemann treated these as two separate properties. Fink was to pay Seemann three lump sums in 1934 for the use of her poems in Das Hummel-Buch. Fink could, according to the contract, prepare translations of the German book only by mutual agreement with Seemann, and the poet would receive a 4% royalty on the retail price of any translated books. As a translation, The Hummel Book itself is a derivative work, the ownership of which "does not imply any exclusive right in the preexisting material." 17 U.S.C. §§ 101, 103. Any rights in a translation of Das Hummel-Buch would therefore not extend to any of the images contained in the original German edition.

in a work made for hire."  Third, a 1971 transfer document, recorded in accordance with 17 U.S.C. § 205, expressly names Fink as owner of the copyright and describes an assignment of the copyright to Goebel.  Fourth, due diligence, including questions to Cambridge, may well have led to information about the litigation which resulted in the 1992 Consent Decree.  There is another point as well.  Cermanovic-Kuzmanovic openly expressed to Herrmann when he telephoned her in 1995 that she was interested in obtaining income from whatever rights she might hold.

Beyond that, if Cermanovic-Kuzmanovic indeed possessed a joint interest in the book's United States copyright as an heir to Seemann, then she would have been entitled to the exclusive right "to prepare derivative works based upon the copyrighted work."  17 U.S.C. § 106(2).  Goebel, meanwhile, had been "openly[] and quite notoriously" exploiting works for decades that appeared in Das Hummel-Buch.[12]  Santa-Rosa, 471 F.3d at 228.  At least one of Goebel's much-used and apparently profitable images appears in Das Hummel-Buch.  Cambridge's complaint points out that Goebel has "for decades utilized, in a particular and crucial fashion, one specific picture . . . popularly known as 'The Merry Wanderer,'" which

_____

[12]  Goebel does not argue that the mere manufacturing and marketing of Hummel figurines put the heirs on notice, regardless of the heirs' knowledge of the source for the figurines.

-27-

"'ultimately became the <u>symbol</u> for the entire M. I. Hummel line.'"
Yet Goebel never paid the heirs for its use of The Merry Wanderer.[13]

The sum, by 1995, of all of this was to start the limitations period running. Publicly available documents in the Copyright Office and prior litigation cast doubt on Cermanovic-Kuzmanovic's rights in <u>Das Hummel-Buch</u>. Moreover, Goebel engaged in widespread exploitation of at least some portion of those rights, such as its use of The Merry Wanderer, without remuneration to Cermanovic-Kuzmanovic. Such circumstances constituted a "plain and express repudiation" of Cermanovic-Kuzmanovic's purported co-ownership rights in <u>Das Hummel-Buch</u> sufficient to trigger the Copyright Act's three-year statute of limitations. <u>Santa-Rosa</u>, 471 F.3d at 228 (internal quotation omitted).

Whether Seemann co-authored <u>Das Hummel-Buch</u> or not, the right to contest that status lay with the poet's heirs until they assigned them to Cambridge. Cermanovic-Kuzmanovic did not file suit by 1998. Cambridge did not resurrect that claim by purchasing an assignment from Cermanovic-Kuzmanovic in 1999. "[A]n assignee cannot maintain a claim in the face of a limitations defense that

---

[13] Cambridge argues that the apparent repudiation of any rights held by Seemann in The Merry Wanderer and other images from <u>Das Hummel-Buch</u> was insufficient because Seemann's heirs could not possibly have known for certain that Goebel was exploiting derivatives of the book. Cambridge maintains this is so because Goebel, if asked, would have denied that it was exploiting derivative works. The heirs, as with any other rights-holder with a potential claim, need not have obtained an admission of liability from Goebel in order for accrual to occur.

would have trumped the same claim had it been brought by the assignor." Young, 305 F.3d at 17.

3.     Tolling

Cambridge argues that a "legal disability" tolled the statute of limitations against its claims based on the assignment from Romanowicz in 1995. Cambridge could not have filed this case until 1999, it claims, because "until then the sole basis for alleging Goebel's exploitation was documents classified as 'SECRET' by a federal court in another earlier matter -- the content of which [Herrmann] was duty bound not to disclose."

Cambridge's position, even taken on its own terms, is baseless. Just as all the reasons we have outlined would have put Cermanovic-Kuzmanovic on notice of a repudiation of Seemann's status as co-author, those reasons provided more than adequate grounds for Cambridge to allege that Goebel had prepared works derivative of the book. Cambridge need not have relied on any documents under protective order to file this lawsuit. There was no tolling of Cambridge's claims based on the Romanowicz assignment.

We affirm summary judgment in favor of defendants. Costs are awarded to defendants.

**-Dissenting Opinion Follows-**

-29-

**CYR, <u>Senior Circuit Judge</u>, dissenting.** The majority opinion holds that since the Cambridge state-law accounting claim might require it to establish as a threshold matter that its predecessor-in-interest, Margarete Seemann, was an original co-owner of the copyright in Das Hummelbuch, the Cambridge claim thus "arises under" the Copyright Act for purposes of both subject matter jurisdiction and, by logical extension, the Act's three-year statute of limitations. Inasmuch as the ramifications of this holding – <u>viz.</u>, that the federal courts have exclusive subject matter jurisdiction to adjudicate all accounting claims between the co-owners of a copyrighted work, <u>see</u> 28 U.S.C. § 1338(a) – are both unprecedented and potentially pernicious, I respectfully dissent.

**I**

The majority relies principally on decisions such as <u>De Sylva</u> v. <u>Ballentine</u>, 351 U.S. 570 (1956), for the proposition that any state-law cause of action which potentially involves a threshold determination of the plaintiff's copyright ownership must be said to "arise under" the Copyright Act (<u>viz.</u>, a <u>de</u> <u>facto</u> federal cause of action), and thus is governed by the Act and subject to its three-year statute of limitations, thereby rendering any discrete inquiry into the scope of the Act's preemptive effect immaterial. However, <u>De Sylva</u> was a non-diversity case in which the plaintiff expressly filed a claim pursuant to the Copyright Act, demanding a <u>declaratory</u> <u>judgment</u> that she was a co-owner of a

-30-

copyrighted work, and consequently the Court assumed that the Copyright Act's substantive definitions concerning copyright ownership governed any decision on the merits of the plaintiff's federal-law claim.  See id. at 975.[14]  To establish subject matter jurisdiction, a declaratory judgment plaintiff normally must demonstrate more than its desire to settle its rights under federal law, but must show "a real and reasonable apprehension" that the defendant plans to sue to establish that the plaintiff is not so entitled, viz., that Goebel planned to litigate a dispute as to whether the Cambridge chain of title originated with a person who was a "co-owner" of the copyright as defined by the Copyright Act of 1909.  See generally, 3-12 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.01 (2005) (noting that "the [federal] Declaratory Judgment Act [28 U.S.C. § 2201(a)] does not, of its own force, confer subject matter jurisdiction on the federal courts"; "[o]nce an action for declaratory relief is instituted, the defendant can attempt to negate the element of reasonable apprehension of litigation by entering a binding covenant not to sue.").  When the plaintiff himself pleads a claim for declaratory

---

[14]    The Cambridge complaint sufficiently invoked the district court's diversity jurisdiction, see 28 U.S.C. § 1332, and thus does not depend on the existence vel non of federal-question jurisdiction.  The jurisdictional analysis is relevant only to the question whether the claim is "maintained" under the Copyright Act, see infra note 21, and thus subject to its three-year statute of limitations, rather than the applicable state-law limitations period.

judgment, the ownership of the Copyright Act title is not merely a potential focus of dispute, it is the only issue relevant to an adjudication of the declaratory action.[15]

In stark contrast, Cambridge filed no federal-law claim for a declaration of copyright ownership under the Copyright Act, but merely a claim in equity for an accounting between tenants in common of property, which is premised entirely on state-created common law. See, e.g., Arsenault v. Arsenault, 148 N.E.2d 662, 663 (Mass. 1958); see also Nimmer on Copyright § 6.12 (noting that a joint owner of a copyrighted work is under an equitable duty to account to other joint owners for a rateable share of the profits realized from his use of the work). For jurisdictional purposes, the plaintiff normally is the "master" of his complaint, and if he pleads a claim purely based in state law, the claim cannot be deemed to have "arise[n] under" federal law, even if it is anticipated that the defendant's answer will deny the plaintiff's factual allegations or will raise federal-law defenses to that state-law claim. See Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 831 (2002) ("[S]ince the plaintiff is

_____

[15] All the other cases cited by the majority are cut from this same cloth, and involve a straightforward holding that a claim which the plaintiff expressly denominates as a federal-law claim obviously must be said to "arise under" the federal statute that it invokes. See Santa-Rosa v. Combo Records, 471 F.3d 224, 227-28 (1st Cir. 2006), cert. denied, 127 S. Ct. 2265 (2007); Gaiman v. McFarlane, 360 F.3d 644, 652 (7th Cir. 2004); Merchant v. Levy, 92 F.3d 51, 55 (2d Cir. 1996); Goodman v. Lee, 78 F.3d 1007, 1011 (5th Cir. 1996).

'the master of the complaint,' the well-pleaded-complaint rule enables him, 'by eschewing claims based on federal law, . . . to have the cause heard in state court.'") (citation omitted); Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987) (noting that plaintiff properly "may avoid federal jurisdiction by exclusive reliance on state law"); Ten Taxpayers Citizens Group v. Cape Wind Assocs., Ltd., 373 F.3d 183, 191 (1st Cir. 2004) (noting that the well-pleaded complaint rule applies "even where the asserted defense is the preemptive effect of a federal statute").

On its face, the Cambridge complaint neither invokes nor calls for the interpretation of any federal law. See Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg., 295 F.3d 59, 63 (1st Cir. 2002) (observing, in dictum, that "[it] is unlikely that any federal cause of action is asserted, even though federal law is the source of the Hummel Book itself"); see also Goodman v. Lee, 78 F.3d 1007, 1012 (5th Cir. 1996) (noting that an accounting claim between joint owners of copyright "is governed in all respects by state law"); Iza Music Corp. v. W & K Music Corp., 995 F. Supp. 417, 418 (S.D.N.Y. 1998) (finding that a state-law accounting claim, in which plaintiff did not seek a declaration of joint ownership under the Copyright Act, did not "arise under" the Act, distinguishing cases like Merchant v. Levy, 92 F.3d 51, 55 (2d Cir. 1996), because they "focus[ed] solely on the claim for a declaration of joint ownership"); accord Keith v.

-33-

Scruggs, 507 F. Supp. 968, 970 (S.D.N.Y. 1981) (finding no federal jurisdiction where denial of the plaintiff's ownership rights under the Copyright Act was merely a potential defense to complaint). Accordingly, De Sylva is legally and factually inapposite.

II

In cases where the complaint articulates a claim exclusively in terms of state law, there are only two narrow exceptions to the well-pleaded complaint rule. Such a claim might be considered to "arise under" federal law for jurisdictional purposes if: (i) an adjudication of the state-law claim necessarily will involve the determination of a "substantial federal question," see Almond v. Capital Props., Inc., 212 F.3d 20, 23 (1st Cir. 2000); or (ii) a federal statute (e.g., the Copyright Act) can be said to exert such a pervasive and overpowering preemptive force that all state-law claims of the type pleaded are "completely preempted," see Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 22, 24 (1983) (noting that plaintiff cannot, by "artful pleading," escape complete preemption); SPGGC, LLC v. Ayotte, 488 F.3d 525, 530 n.4 (1st Cir. 2007) (noting that complete preemption "converts the state claim into a federal claim"). In my view, the Cambridge accounting claim satisfies neither exception.

**A.    "Substantial Federal Question" ("SFQ") Jurisdiction**

Goebel suggests that, even though the Cambridge accounting claim makes no mention of the Copyright Act, it "arises

under" the Act in that Cambridge obviously would not be entitled to a state-law accounting if it were not a co-owner of the Das Hummelbuch copyright, a status which in turn depends, inter alia, on Cambridge establishing that Margarete Seemann originally fit the co-ownership definitions of the Act. See 17 U.S.C. § 101 (noting that "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole"); id. § 201(a) ("The authors of a joint work are co-owners of copyright in the work.").[16]

---

[16] Oddly enough, given the fact that the case has proceeded to the summary judgment stage, Goebel has yet to file an answer to the Cambridge complaint, see Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444, 449 (1st Cir. 1995) (noting that affirmative defenses normally are waived if not filed in initial responsive pleadings), has yet to deny the Cambridge allegation that Cambridge is a valid copyright co-owner (via descent and contract) of Seemann's original title, and has not produced a Rule 56 evidentiary proffer which would call the Seemann joint ownership into doubt. See H.R. Rep. No. 94-1476, 120, 121 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5736 (noting that co-ownership inquiry must focus on "the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit"); Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998). Rather, Goebel simply maintains on appeal that the mere possibility of such a factual dispute satisfies the SFQ exception to the well-pleaded complaint. Goebel would face three considerable hurdles, however, if it were to pursue such a denial: (i) Das Hummelbuch, on its face, appears to be a unitary and fully integrated creation of artwork and poetry, viz., a "joint work" as defined by § 101 and § 201(a), see Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 877 (5th Cir. 1997) (noting that the contribution of an independent contractor will not be deemed a "work for hire" unless it fits into "one of the nine narrowly drawn categories of works"); (ii) Seemann's listing as an author on the certificate of registration creates a rebuttable presumption of her joint authorship and ownership, see Brown v. Latin Am. Music Co., 498 F.3d 18, 23 (1st Cir. 2007) (citing 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before

Admittedly, "[d]etermining precisely which [state-law] actions 'arise under' copyright law, and therefore fall within exclusive federal jurisdiction, 'poses among the knottiest procedural problems in copyright jurisprudence.'" Gener-Villar v. Ad-Com Group, Inc., 417 F.3d 201, 203 (1st Cir. 2005) (quoting Nimmer on Copyright § 12.01[A]).  Nonetheless, since the "federal courts are courts of limited jurisdiction, . . . [they] must 'monitor their jurisdictional boundaries vigilantly.'"  Diaz-Rodriguez v. Pep Boys Corp., 410 F.3d 56, 62 n.5 (1st Cir. 2005) (emphasis added; citation omitted). The "controversial" SFQ exception thus "endures in principle but should be applied with caution and various qualifications."  Rossello-Gonzalez v. Calderon-Serra, 398 F.3d 1, 11-12 (1st Cir. 2004) ("Federal ingredient jurisdiction remains 'controversial,' because '[t]he Supreme Court has periodically affirmed this basis for jurisdiction in the abstract . . . , occasionally cast doubt upon it, rarely applied it in practice, and left the very scope of the concept

_____

or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.")); and (iii) any rebuttal of this presumption would depend on Goebel's proof of the contrary intention of persons long since deceased, see, e.g., Stuart & Sons, L.P. v. Curtis Publ'g. Co., 456 F. Supp. 2d 336, 348 (D. Conn. 2006).

unclear.'")(quoting Almond, 212 F.3d at 23); see Metheny v. Becker, 352 F.3d 458, 460 (1st Cir. 2003).[17]

Such special caution is necessary in the instant case because if the SFQ exception were found to have been satisfied merely because the Goebel answer might deny and dispute the plaintiff's copyright co-ownership as a "defense" to the Cambridge state-law accounting claim, see supra note 16, then all state-law accounting claims between copyright co-owners must "arise under" the Copyright Act, even where there is no genuine factual dispute under 17 U.S.C. §§ 101 and 201(a) regarding the provenance of the plaintiff's title. In the vast majority of accounting cases, the parties are likely to stipulate the plaintiff's co-ownership under these Copyright Act definitions, hence state-law issues will predominate the adjudication of the accounting claim. Since the federal courts have exclusive jurisdiction to decide Copyright Act cases, however, see 28 U.S.C. § 1338(a), all such claims would be removable as of right from state to federal court, thus effecting a significant expansion of our "federal question" jurisdiction.[18]

---

[17] Although most cases discussing the SFQ jurisdictional exception have involved general federal question jurisdiction, 28 U.S.C. §§ 1331, 1441, the exception is equally available to establish "copyright" jurisdiction under 28 U.S.C. § 1338(a). See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808-809 (1988).

[18] Even outside the context of copyright co-ownership claims, if the mere possibility of a dispute concerning the interpretation of federal copyright law is sufficient to satisfy the SFQ exception, many other state-law claims which are not

More importantly, the SFQ exception neither permits nor requires such a dramatic expansion of our limited jurisdiction.

### 1.   **The SFQ Jurisdictional Test**

In Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312-14 (2005), the Supreme Court recently elaborated on the inherent limitations of the SFQ exception to the well-pleaded complaint rule, which it originally pronounced more broadly in Smith v. Kansas City Title & Trust Co., 255 U.S. 180 (1921).[19]  "[T]he mere need to apply federal law in a state-law claim will [not] suffice to open the 'arising under' door. . . . [T]his Court [has] confined [it] to those [state-law claims] that 'really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law.'" Grable, 545 U.S. at 313 (noting that the SFQ exception "demands not only a contested federal issue, but a substantial one, indicating a serious federal interest in claiming the advantages thought to be

---

preempted by the Copyright Act (viz., those which include an "extra element" beyond mere infringement) nonetheless would be deemed to "arise under" federal law.  See infra Section II.C.

[19]    In Smith, plaintiff sought to enjoin corporate directors from investing in a federally chartered land bank, pursuant to a state law which prohibited directors from investing in any government bonds that were issued in violation of the law.  Smith, 255 U.S. at 195-96.  Plaintiff's complaint alleged that the directors had breached their fiduciary duty to the shareholders because the federal law which authorized the directors of a federal land bank to issue bonds was unconstitutional and invalid.  Id. at 197-98.  The Court found SFQ jurisdiction because the plaintiff could only prevail on his statutory claim for breach of fiduciary duty by proving his federal constitutional claim.  Id. at 201.

inherent in a federal forum") (emphasis added; citation omitted); see Merrell Dow Pharm. v. Thompson, 478 U.S. 804, 813 (1986) ("[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction."); Dunlap v. G&L Holding Group, Inc., 381 F.3d 1285, 1290 (11th Cir. 2004). In other words, "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314 (emphasis added). The Court admonished that the federal courts should invoke the SFQ exception only if it is "consistent with congressional judgment about the sound division of labor between state and federal courts." Id. at 313-14. Further, "the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dispositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction." Id. at 314.

The Grable Court found the SFQ exception satisfied because the plaintiff's state-law complaint, which sought to quiet title to property which the Internal Revenue Service seized and sold at auction to a third party, depended entirely on a dispute about the adequacy of the IRS's compliance with seizure notification procedures set forth in the federal tax code, see 26

U.S.C. § 6335. <u>Grable</u>, 545 U.S. at 315 ("Whether Grable was given [adequate] notice within the meaning of the federal statute is thus an essential element of its quiet title claim, and the meaning of the federal statute is <u>actually in dispute</u>; it appears to be the only legal and factual dispute.") (emphasis added).

<u>Grable</u> thus requires us to undertake two inquiries: whether (i) the Cambridge state-law complaint, on its face, and without reference to any possible defenses, "necessarily" discloses an "actual" and "substantial" dispute concerning the interpretation of the Copyright Act; and (ii) invocation of the SFQ exception would be consistent with any congressional policy in enacting the Copyright Act as to the proper balancing of jurisdiction between the federal and state courts.[20]

---

[20]    We often cite the principle set forth in <u>T.B. Harms Co.</u> v. <u>Eliscu</u>, 339 F.2d 823, 828 (2d Cir. 1964) (noting that a claim "arises under" the Copyright Act if, <u>inter alia</u>, it "asserts a claim requiring construction of the Act"), as a device to establish the <u>absence</u> of federal question jurisdiction, <u>see</u>, <u>e.g.</u>, <u>id.</u> at 827 (noting that "if any aspect of the suit <u>requires</u> an interpretation of the Copyright Act, the complaint does not reveal it") (emphasis added), but we have been reluctant to embrace the test as a reliable means to establish the <u>presence</u> of SFQ jurisdiction. <u>See</u>, <u>e.g.</u>, <u>Genar-Villar</u>, 417 F.3d at 206 n.5 ("We need not decide whether the Puerto Rico court's analysis of federal copyright preemption law [<u>viz.</u>, that it lacked jurisdiction to decide copyright ownership interests] was precisely correct because, in any event, the [] court viewed its jurisdiction as limited to Puerto Rico claims."); <u>First Fed. Sav. and Loan Ass'n</u> v. <u>Greenwald</u>, 591 F.2d 417, 423 (1st Cir. 1979) (noting that "some circuits have taken a broader view of federal question jurisdiction, namely that '(e)ven though the claim is created by state law, a case may "arise under" a law of the United States if the complaint discloses a need for determining the meaning or application of such a law,'" but then refusing to decide whether or not to adopt that rule as

## 2. **The "Actual" and "Substantial" Dispute Criterion**

Like the plaintiff's complaint in <u>De Sylva</u>, 351 U.S. 570, <u>supra</u>, the Grable complaint – <u>on its face</u> – placed the meaning of a federal statute in active dispute. If the <u>Grable</u> defendant eventually did not challenge the plaintiff's interpretation of the federal seizure-notification statute, it necessarily would lose the lawsuit, because it would thereby concede its violation of its fiduciary duty under state corporation law. Thus, it was reasonable to anticipate, from the complaint itself, that the federal constitutional issue was substantial and that it would have to be adjudicated.

By contrast, although the Cambridge complaint may depend in the abstract on Seemann's original copyright co-ownership, that fact alone is insufficient to satisfy <u>Grable</u>'s heightened "active dispute" test. The ultimate success of the Cambridge complaint may depend on an actual adjudication of any number of issues, federal and non-federal, which are not yet apparent at the pleading stage. See <u>Royal</u> v. <u>Leading Edge Prods., Inc.</u>, 833 F.2d 1, 2-3 (1st Cir. 1987) (finding no jurisdiction, even though, if plaintiff succeeded in obtaining contract rescission, the court would need to apply 17 U.S.C. § 201(b) to defeat his claim; "[t]he work-made-for-hire

---

circuit law) (citation omitted); <u>see</u> <u>also</u> <u>Royal</u> v. <u>Leading Edge Prods., Inc.</u>, 833 F.2d 1, 2 (1st Cir. 1987) (referring to the <u>T.B. Harms</u> test as merely "the most frequently cited test," but finding no federal jurisdiction).

doctrine is, at best, only tangentially implicated [and] [i]ndeed, it is not even mentioned in the complaint"); see also Cambridge Literary, 295 F.3d at 64 n.4 ("It is possible to imagine a Massachusetts court looking to federal copyright law and German contract law as to whether Hummel, Seemann, and Fink are co-owners; Austrian inheritance law if the Seemann rights are disputed; federal copyright law as to whether the figurines are derivative works; and to the law of any of several jurisdictions as to rights and defenses among co-owners and available remedies."); Derminer v. Kramer, 386 F. Supp. 2d 905, 912 (E.D. Mich. 2005). For example, Goebel itself notes that, if Goebel denies the allegation, Cambridge eventually may need to prove as well that the Hummel figurines were "derivative works" from the illustrations contained in Das Hummelbuch, see 17 U.S.C. § 101, and failure to establish that fact might prove equally dispositive and fatal to the accounting claim. Grable makes clear, however, that the mere presence of these potential federal issues is insufficient to create SFQ jurisdiction.

Unlike the plaintiff in De Sylva, who expressly included in his complaint a request for a declaration of his co-ownership rights in the copyright, the Cambridge complaint does not place its co-ownership of the copyright in "active dispute." Such an active dispute would arise, if at all, at the time Goebel files its answer to the complaint, see supra note 16, and pursuant to the well-

-42-

pleaded complaint rule, this is insufficient to invoke SFQ jurisdiction. Further, it simply is not the case that Goebel necessarily will forfeit its chances of winning the case if it chooses not to contest the Cambridge co-ownership interests. If Goebel stipulates to the Cambridge co-ownership rights under 17 U.S.C. §§ 101 and 201(a), it will have done no more than concede Cambridge's standing to bring suit under state law.

### 3. The "Congressional Intent" Requirement

Application of the SFQ exception to this type of accounting claim between copyright co-owners also would serve no apparent congressional policy concerning the proper allocation of jurisdictional labor between the federal and state courts in cases which happen to involve copyrighted material. See Templeton Bd. of Sewer Comm'rs v. Am. Tissue Mills of Mass., Inc., 352 F.3d 33, 40-41 (1st Cir. 2003) ("We do not believe that merely because a court will have to interpret the federal regulations, it necessarily follows that federal jurisdiction exists. . . . '[T]he determination of whether a federal issue is sufficiently substantial should be informed by a sensitive judgment about whether the existence of federal judicial power is both appropriate and pragmatic,' and . . . 'at bottom, we must determine whether the dispute is one that Congress intended federal courts to resolve.'") (citations omitted); Nimmer on Copyright § 12.01.

The Copyright Act and its preemption provision expressly apply to acts of copyright infringement, viz., the unauthorized use and exploitation of copyrighted materials by a person who neither owns the copyright nor has a valid license. See 17 U.S.C. § 301(a) (preempting only those "legal and equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in § 106") (emphasis added); id. § 106 (providing that "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following [acts].") (emphasis added). By definition, however, a co-owner who profits from the copyright cannot "infringe" or make "unauthorized use" of the copyright, as that concept is defined in 17 U.S.C. § 106. See Weissmann v. Freeman, 868 F.2d 1313, 1318 (2nd Cir. 1989) ("[A]n action for infringement between joint owners will not lie because an individual cannot infringe his own copyright"); Quintanilla v. Tex. Television, Inc., 3 F. Supp. 2d 747, 753 (S.D. Tex. 1997), aff'd, 139 F.3d 494 (5th Cir. 1998).

Instead, the Copyright Act, which sets forth express remedies available to copyright owners against infringers, deliberately omits any comparable express or implied remedy for a co-owner seeking an accounting from a joint copyright owner who has profited from use of the copyright. The Act's legislative history unambiguously explains the reason for this omission: "[t]here is . . . no need for a specific statutory provision concerning [the]

rights and duties of the coowners of a work; court-made law on this point is left undisturbed." H.R. Rep. No. 94-1676, at 121, reprinted in 1976 U.S.C.C.A.N. 5659, 5736. To the extent that this residual court-made law involves the common-law rights of tenants in common, the primary source always has been state (and not federal) law, and the Copyright Act contains no hint that Congress intended to usurp the state courts' traditional jurisdiction to adjudicate these types of claims. See Nimmer on Copyright § 6.10; Goodman, 78 F.3d at 1012 ("The applicability of federal law ends with that determination [of non-preemption], as Goodman's claim for an accounting is governed in all respects by state law. It is widely recognized that '[a] co-owner of a copyright must account to other co-owners for any profits he earns from the licensing or use of the copyright . . . .' Significantly, 'the duty to account does not derive from the copyright law's proscription of infringement. Rather, it comes from ". . . general principles of law governing the rights of co-owners."' As those general principles are rooted in state law, we look to the law of Louisiana for answers to the remaining issues presented by this appeal.") (citations omitted); Oddo v. Ries, 743 F.2d 630, 633 n.2 (9th Cir. 1984) (same, concluding that "a suit to bring the co-owner of a copyright to account does not fall within the district court's jurisdiction over actions arising under [§ 1338]"); Dead Kennedys v. Biafra, 37 F. Supp. 2d 1151, 1153 (N.D. Cal. 1999).

In a case where the federal law at issue does not contain any comparable remedy (or at least a partial remedy), one reasonably cannot surmise that Congress saw the asserted federal interest as "substantial," and thus invocation of SFQ jurisdiction is simply inappropriate. See, e.g., Merrell Dow, 478 U.S. at 817 ("[A] [state-law negligence] complaint [against a drug manufacturer] alleging a violation of a federal statute [viz., a federal statute banning misbranding of prescription drugs] as an element of a state cause of action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim 'arising under'" § 1331.").[21]

Because Cambridge's state-law accounting meets neither of the two SFQ jurisdictional criteria elaborated in Grable, it cannot be said to "arise under" the Copyright Act.

## B.  Complete Preemption

Similarly, the complete preemption doctrine does not permit us to disregard the well-pleaded complaint rule and

---

[21]    Further evidence of a lack of congressional intention can be seen in the Copyright Act's statute-of-limitations provision. Rather than stating, in typical fashion, that the limitations period applies to all actions "arising under" the Act, the limitations apply only to those claims "maintained under" the Act. 17 U.S.C. § 507(b) (emphasis added); see Goodman, 78 F.3d at 1013 (noting that even though state-law accounting claim arises under Copyright Act for jurisdictional purposes, the Act's three-year limitations period is not triggered, because the Act contains no remedy as between copyright co-owners, and thus the accounting claim cannot be said to be "maintained" under the Act, but instead is maintained under state law).

recharacterize – as mere "artful pleading" – the Cambridge state-law accounting claim as a federal-law claim "arising under" the Copyright Act.[22]   The Act plainly does not exert such an overpowering preemptive force as to bring under the federal courts' subject matter jurisdiction all state-law causes of action between co-owners of a copyrighted work.  See Caterpillar, 482 U.S. at 393 (observing that federal statute's preemptive effect must be "extraordinary" to trigger complete preemption); Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 64 (1987).  Federal courts, as courts of limited jurisdiction, should implement federal preemption doctrines as narrowly as possible.  See Lontz v. Tharp, 413 F.3d 435, 440 (4th Cir. 2005) (noting that there is a rebuttable presumption against finding complete preemption, so that "[d]efendants' burden is to demonstrate that a federal statute indisputably displaces any state cause of action over a given subject matter") (citation omitted); see also Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, 14B Federal Practice and Procedure: Jurisdiction 3d § 3722.1, at 517 ("Because of the obvious federalism implications of the complete preemption

---

[22]     Complete preemption, which is a jurisdictional principle, is distinct from normal "conflict" preemption, see SPGGC, 488 F.3d at 530 n.4, 534; Bruneau v. FDIC, 981 F.2d 175, 179-80 (5th Cir. 1992); Franks v. Waterfield Mortgage Co., No. 1:06-00227, 2007 WL 1232218, at *3 (N.D. Ind. Apr. 24, 2007), the latter being an affirmative defense which defendant must plead and prove, see Fifth Third Bank ex rel. Trust Officer v. CSX Corp., 415 F.3d 741, 745 (7th Cir. 2005); infra section II.C.

doctrine, its application has been extremely limited by the courts."). Complete preemption analysis thus depends on the existence of palpable evidence that Congress intended to displace completely a particular category of state-law causes of action, as manifested by the federal statute's language, overall structure, and legislative history. See Metro. Life, 481 U.S. at 65; Magee v. Exxon Corp., 135 F.3d 599, 601-02 (8th Cir. 1998).

Unlike the few federal statutes which have been found to effect complete preemption (e.g., the governance of the Employee Retirement Income Security Act (ERISA) over all plan-"related" causes of action, see Metro. Life, 481 U.S. at 67; Hotz v. Blue Cross and Blue Shield of Mass., Inc., 292 F.3d 57, 59 (1st Cir. 2002)), the Copyright Act does not encompass all claims simply because the parties' dispute happens to involve a copyrighted work. See Venegas-Hernández v. Asociación de Compositores y Editores de Música Latinoamericana, 424 F.3d 50, 58 (1st Cir. 2005) ("The Copyright Act does not draw into federal court all matters that pertain to copyright."); Royal, 833 F.2d at 2. Further, although the Copyright Act (unlike ERISA, for example) gives the federal courts exclusive (rather than concurrent) jurisdiction over any claims which arise under the Act, see 28 U.S.C. § 1338(a), this jurisdictional canon necessarily presupposes an antecedent inquiry as to whether a particular state-law cause of action involving a

copyrighted work can be said to "arise under" the Act in the first instance.

Unlike ERISA, 29 U.S.C. § 1144(a) (providing that ERISA "shall supersede <u>any</u> <u>and</u> <u>all</u> State laws" to the extent that those laws "<u>relate</u> <u>to</u> any employee benefit plan") (emphasis added), the Copyright Act's preemption provisions are not even remotely panoptic. The Copyright Act preempts only those "legal and equitable rights that are <u>equivalent</u> <u>to</u> any of the exclusive rights within the general scope of copyright <u>as</u> <u>specified</u> <u>in</u> § <u>106</u>." 17 U.S.C. § 301(a) (emphasis added). Further, "[n]othing in [the Act] annuls or limits any <u>rights</u> <u>or</u> <u>remedies</u> <u>under</u> <u>the</u> <u>common</u> <u>law</u> <u>or</u> <u>statutes</u> <u>of</u> <u>any</u> <u>State</u> with respect to – . . . activities violating legal or equitable rights that are not the equivalent to any of the <u>exclusive</u> rights within the general scope of copyright as specified in section 106A with respect to works of visual art." <u>Id.</u> § 301(b)(3) (emphasis added); <u>see</u> <u>Blab T.V. of Mobile, Inc.</u> v. <u>Comcast Cable Commc'ns, Inc.</u>, 182 F.3d 851, 857 (11th Cir. 1999) (finding no complete preemption because the federal Cable Act contained language which "preserv[ed] state authority except in areas in which the exercise of this authority would be inconsistent with federal law"); <u>cf.</u> <u>Metro. Life</u>, 481 U.S. at 65-66 (citing – as affirmative evidence of complete preemption – legislative history that "[a]ll such actions in Federal or State courts are to be regarded as arising under the laws of the United States in similar

-49-

fashion to those brought under section 301 of the Labor-Management Relations Act of 1947").[23]

More importantly, the Copyright Act does not preempt all state-law claims between copyright co-owners, since the Act itself creates no alternative federal cause of action, remedy, or procedural mechanisms to govern such claims. See Franchise Tax Bd., 463 U.S. at 24 ("[I]f a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law.") (emphasis added); Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 8 (2003) (finding that National Bank Act completely preempted state-law cause of action because it "provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action") (emphasis added); Metheny, 352 F.3d at 460 (noting that complete preemption does not pertain where federal statute "lacks a federal enforcement mechanism by which plaintiffs may proceed with claims of the type asserted in this action"); Bd. of Chosen Freeholders v. Tombs, No. 04-3804, 2006 WL 3713109, at *2 (3d Cir. Dec. 18, 2006)

---

[23] The two courts of appeals which have held that the Copyright Act completely preempts state law notably involved state causes of action which were the functional equivalent of federal claims for copyright infringement, and not state causes of action between copyright co-owners. See Ritchie v. Williams, 395 F.3d 283, 287-88 (6th Cir. 2005) (finding that Copyright Act completely preempts all state-law claims which are the qualitative equivalent of a copyright infringement suit); Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 232 (4th Cir. 1993) (same).

(unpublished); Ultramar Am. Ltd. v. Dwelle, 900 F.2d 1412, 1416 (9th Cir. 1990) ("[W]here federal law preempts state law yet fails to provide its own cause of action . . . although federal law is a perfectly valid defense to a state claim, that claim cannot be said to actually be a federal claim, for no federal right of action exists on point."); Korman v. Iglesias, 736 F. Supp. 261, 265 (S.D. Fla. 1990) ("[T]he Copyright Act neglected to provide for remedies between co-authors [and so] . . . Congress must have intended that co-authors may claim for an accounting or otherwise proceed under common law principles.").  Indeed, as previously noted, the Act's legislative history plainly discloses Congress' intent to leave such disputes outside the federal court's exclusive copyright jurisdiction.  See H.R. Rep. No. 94-1676, at 121, reprinted in 1976 U.S.C.C.A.N. 5659, 5736.

As the Cambridge state-law accounting claim runs afoul of neither the SFQ jurisdictional criterion, nor the complete

preemption criterion, it does not "arise under" the Copyright Act.[24]

Hence, the Act's three-year limitations period is not applicable.[25]

---

[24] Assuming arguendo that the Copyright Act's limitations period applied to the Cambridge accounting claim, I would be compelled to dissent.  In my view, Cambridge has demonstrated on appeal that several material factual disputes remain as to when its accounting claim accrued, thus precluding, as a matter of law, any Rule 56 determination of the accrual date.  See Massey v. United States, 312 F.3d 272, 276 (7th Cir. 2002) ("Summary judgment is properly granted on the basis of a statute of limitations defense if . . . there exist no genuine issues of material fact regarding the time at which plaintiff's claim has accrued.").

[25] The district court held, in the alternative, that even if the Copyright Act's three-year limitations period did not apply to the Cambridge accounting claim, the claim still would be governed by the state's three-year limitations period applicable to tort actions.  This alternative holding is demonstrably wrong, for two reasons.  First, Goebel would be estopped from asserting this argument by its previous statement, in its first appeal on the personal jurisdiction issue, that Cambridge "does not assert a cause of action based on tortious activity either within or outside Massachusetts."  See Cadle Co. v. Schlichtmann, Conway, Crowley & Hugo, 338 F.3d 19, 23 (1st Cir. 2003) ("'We generally will not permit litigants to assert contradictory positions at different stages of a lawsuit in order to advance their interests.'") (citation omitted).  Second, the Cambridge accounting claim does not allege that Goebel wrongly retained or converted profits that it derived from Das Hummelbuch, nor could it do so because, as a co-owner of the copyrighted work, Goebel is free to use the copyright to its fullest.  See Goodman, 78 F.3d at 1012.  Only once its co-owners make a suitable demand for an accounting would Goebel have an equitable duty to account to all of its co-owners for their respective shares of those profits.  See Bacon v. Bacon, 165 N.E. 485, 488 (Mass. 1929); Dapkus v. Dapkus, No. 269521-KFS, 2007 WL 1229399, at *3 (Mass. Land Ct. Apr. 26, 2007) (unpublished); see also Goodman, 78 F.3d at 1013 ("Under Louisiana law, an action by a co-owner for an accounting is governed by a ten-year prescriptive period (statute of limitations), which 'd[oes] not begin to run until demand is made . . . for an accounting.'") (citation omitted); Bushner v. Bushner, 307 P.2d 204, 208 (Colo. 1957); Goergen v. Maar, 153 N.Y.S.2d 826, 831 (N.Y. App. Div. 1956); Harrell v. Samson Res. Co., 980 P.2d 99, 107 (Okla. 1998); Hallmark v. Tidwell, 849 S.W.2d 787, 791 (Tenn. App. 1992).

## C.  The Affirmative Defense of Preemption

The district court dismissed the Cambridge complaint on the ground that the Copyright Act preempted the Cambridge accounting claim.  Many of the same factors that preclude our finding that the Copyright Act completely preempts the Cambridge state-law accounting claim likewise would militate against any finding for Goebel at summary judgment on its preemption defense. See Fifth Third Bank, 415 F.3d at 745 (noting that preemption is an affirmative offense upon which defendant bears the burden of proof); see also Brown v. Earthboard Sports USA, 481 F.3d 901, 913 (6th Cir. 2007).  With respect to the preemption of state-law causes of action involving copyrighted works, we have applied the two-pronged "subject matter"/"extra-element" test, Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1164-65 (1st Cir. 1994) (finding no Copyright Act preemption of state-law claim for trade secrets misappropriation because latter involved "extra element" – viz., breach of a fiduciary duty – not found in a copyright infringement claim); see also Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc., 307 F.3d 197, 217-19 (3d Cir. 2002); Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc., 220 F.3d 396, 404-05 (5th Cir. 2000), and again inquire whether the particular state law at issue is the functional equivalent of a federal copyright infringement action, or instead is qualitatively different from a copyright infringement claim.

-53-

See 17 U.S.C. § 301(a) (preempting state causes of action which are premised on rights "equivalent to" copyright-holder's exclusive rights of use set forth in § 106"); Stromback v. New Line Cinema, 384 F.3d 283, 301 (6th Cir. 2004).

Under the Data General test, the state-law accounting claim between co-owners of a copyrighted work, which sounds neither in contract nor tort, but in equitable principles of trust as between joint property owners, see, e.g., Bacon v. Bacon, 165 N.E. 485, 473 (Mass. 1929) (describing co-owner relationship as fiduciary in nature); supra note 25, is not preempted because it is not the qualitative equivalent of a copyright infringement claim under the Copyright Act. Further, the Cambridge state-law accounting claim requires an extra element not found in a copyright infringement case: an existing equitable trust relationship between the parties. In Data General, the relationship was fiduciary; here, the relationship is joint ownership of property giving rise to an equitable duty to provide an accounting of profits. The Copyright Act does not preempt the state-law accounting claim, and thus it cannot be dismissed on preemption grounds.

## III

## CONCLUSION

In order to bring the Cambridge state-law cause of action under the Copyright Act's three-year limitations provision, the majority announces a blanket jurisdictional rule which threatens to

-54-

draw into the federal courts many copyright-related claims over which Congress deliberately intended to give the state courts concurrent jurisdiction. As the state courts are perfectly competent to interpret Copyright Act definitions that may be tangentially relevant to their disposition of state-law causes of action, the mere possibility that they may need to consult those statutory definitions should not convert claims which essentially arise under state law into federal claims, particularly where the corresponding federal statute has eschewed comparable remedies. Therefore, I respectfully dissent.